**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **CLARK RESOURCES, INC.,** : | |
| Plaintiff : | |
| : | Civil Action No. 1:10-cv-1119 |
| v. : | (Chief Judge Kane) |
| : | |
| **VERIZON BUSINESS NETWORK** : | |
| **SERVICES, INC.,** : | |
| Defendant : | |

**MEMORANDUM**

Before the Court is Defendant Verizon Business Network's motion to dismiss Plaintiff Clark Resources's amended complaint brought pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. No. 22.) Plaintiff's claims arise from an alleged breach of contract related to a Pennsylvania Department of General Services Request for Proposal in which Defendant served as a general contractor and Plaintiff served as a subcontractor. This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1). For the reasons stated herein, the Court will grant Defendant's motion in part.

**I.   BACKGROUND**[1]

**A.   Factual Background**

Plaintiff's claims arise from the alleged existence of two contracts: (1) an agreement to perform subcontractor duties for Defendant ("performance contract"); and, in the alternative, (2)

---

[1] In reviewing the motion to dismiss, the Court will accept Plaintiff's factual allegations as true and will "consider only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim." Lum v. Bank of Am., 361 F.3d 217, 221 n.3 (3d Cir. 2004); see also Phillips v. Cnty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008).

the existence of a contract to negotiate the terms of the subcontract in good faith. According to Plaintiff's amended complaint, on November 12, 2008, the Pennsylvania Department of General Services issued a Request for Proposal related to a telecommunications project. (Doc. No. 21 ¶ 5.) Defendant contacted Plaintiff to solicit Plaintiff's assistance in Defendant's bid for the project. (Id. ¶ 12.) The parties agreed to work exclusively together to submit a proposal to the Department. (Id. ¶ 14.) Pursuant to this agreement, Defendant informed Plaintiff of the scope of work needed on the subcontract and requested the information necessary to submit a proposal to the Department for the prime contract. (Id. ¶¶ 20-21.) In response to Defendant's request, Plaintiff produced a subcontract proposal in February 2009, indicating that it would supply Defendant with seven "helpdesk agents" for the project over the course of seven years at a total cost of $2,806,505. (Id. ¶ 24.) Defendant ultimately used Plaintiff's proposal when submitting its own proposal to the Department, and identified Plaintiff in the proposal as a certified minority business enterprise. (Id. ¶ 25.)

Plaintiff contends that prior to the ultimate award of the contract, Defendant provided Plaintiff with oral and written assurances that Defendant would use Plaintiff as a subcontractor on the project, contingent on the award from the Department. (Id. ¶¶ 27-30.) Plaintiff notes that Defendant referred to Plaintiff as a member of "the Verizon team" during Defendant's presentation to the Department. (Id. ¶ 32.) And Defendant "orally agreed to negotiate in good faith with Clark to enter into a final written subcontract for the Scope of Services if Verizon obtained an award of the prime contract from DGS." (Id. ¶¶ 16-17.) Plaintiff further contends that Plaintiff engaged in lobbying efforts in support of Defendant's proposal in exchange for Defendant's promise to use Plaintiff as a subcontractor on the project. (Id. ¶¶ 15, 22, 26, 31-32.)

On September 25, 2009, Defendant informed Plaintiff that it would only require two of Plaintiff's helpdesk agents to work on the project, rather than the seven Plaintiff had anticipated. (Id. ¶ 34.) Plaintiff concluded the reduced scope of work would render the subcontract unprofitable and refused to accept Defendant's offer. (Id. ¶¶ 36-37.) On September 28, 2009, Defendant reiterated its position that it would only require two full time staff to fulfill the subcontract, but indicated that it was "hopeful" that the parties would "be able to reach mutually acceptable terms for a subcontract agreement." (Doc. No. 21-1, Ex. K.) When Defendant's proposal was subsequently accepted by the Department on October 9, 2009, Defendant awarded the subcontract to another party. (Id. ¶ 40.)

### B.  Procedural History

Plaintiff commenced this suit on April 26, 2010, in the Court of Common Pleas for Dauphin County, Pennsylvania, asserting five causes of action based on Pennsylvania law.[2] (Doc. No. 1-2.) Defendant removed the action to this Court on May 24, 2010. (Doc. No. 1.) Following an unopposed motion for enlargement of time to respond, Defendant filed a motion to dismiss the complaint. (Doc. No. 6.) At the conclusion of briefing, the Court granted in part Defendant's motion to dismiss the first complaint and granted Plaintiff leave to file an amended complaint. (Doc. No. 18.) Plaintiff filed an amended complaint on December 13, 2010. (Doc. No. 21.) On January 3, 2011, Defendant filed a motion to dismiss the amended complaint in full. (Doc. No. 22.)

## II.  STANDARD OF REVIEW

A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of the complaint.

---

[2] The parties do not dispute that Pennsylvania substantive law applies to this action.

Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993). In reviewing a motion to dismiss, a court may "consider only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim." Lum, 361 F.3d at 221 n.3. The motion will only be properly granted when, taking all factual allegations and inferences drawn therefrom as true, the moving party is entitled to judgment as a matter of law. Markowitz v. Ne. Land Co., 906 F.2d 100, 103 (3d Cir. 1990). The burden is on the moving party to show that no claim has been stated. Johnsrud v. Carter, 620 F.2d 29, 33 (3d Cir. 1980). Thus, the moving party must show that Plaintiff has failed to "set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that those elements exist." Kost, 1 F.3d at 183 (citations omitted). A court, however, "need not credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss." Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906, 908 (3d Cir. 1997). Indeed, the Supreme Court has held that while the 12(b)(6) standard does not require "detailed factual allegations," there must be a "'showing,' rather than a blanket assertion of entitlement to relief. . . . '[F]actual allegations must be enough to raise a right to relief above the speculative level.'" Phillips, 515 F.3d at 231-32 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). Put otherwise, a civil complaint must "set out 'sufficient factual matter' to show that the claim is facially plausible." Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009) (quoting Ashcroft v. Iqbal, 129 S. Ct. 1937, 1955 (2009)).

## III.   DISCUSSION

In its amended complaint, Plaintiff raises three claims for relief. Count I asserts a claim for breach of contract for Defendant's failure to award Plaintiff the subcontract. Count II asserts

a claim for breach of contract for Defendant's failure to negotiate the subcontract proposal in good faith. Finally, Count III asserts a claim for unjust enrichment because Plaintiff was not compensated for the lobbying efforts it undertook on behalf of Defendant's proposal. The Court will consider Defendant's motion to dismiss each claim seriatim.

    A.    **Count I: Breach of Performance Contract**

As explained by the Court in its November 30, 2010 order dismissing Plaintiff's contract claim (Doc. No. 18), a subcontractor's bid to a contractor is nothing more than an offer to contract. See, e.g., Project Dev. Grp., Inc. v. O.H. Materials Corp., 766 F. Supp. 1348, 1352 (W.D. Pa. 1991), aff'd 993 F.2d 225 (3d Cir. 1993); see also 1 A. Corbin, Corbin on Contracts § 2.31 (Rev. ed. 1993) ("Use of the bid is not an acceptance."). Further, the Request for Proposal process alone does not give rise to a binding contractual relationship. Commonwealth v. On-Point Tech. Sys., Inc., 821 A.2d 641, 649 (Pa. Commw. Ct. 2003).

Plaintiff's amended complaint, however, makes clear that Plaintiff does not rely solely on the Request for Proposal or its submission of a bid as the basis of the alleged contract. Rather, under Plaintiff's theory, a contract was formed when Defendant accepted Plaintiff's bid and then orally assured Plaintiff that Defendant would use Plaintiff's services if the Department ultimately awarded the contract to Defendant. (Doc. No. 23 at 12-13 (citing Prime Bldg. Corp. v. Itron, Inc., 22 F. Supp. 2d 440, 442-45 (E.D. Pa. 1998) (denying defendant's motion for summary judgment and holding that a general contractor's use of a subcontract bid coupled with oral assurances that the subcontract would be honored could be sufficient to establish the existence of an agreement).) Specifically, Plaintiff alleges that on February 25, 2009, two of Defendant's agents assured Plaintiff that the parties had an agreement whereby Plaintiff would perform the

5

scope of work identified in Defendant's proposal, contingent only upon Commonwealth awarding the prime contract to Defendant. (Doc. 21 ¶¶ 27-28.) Additionally, Plaintiff asserts that on August 3, 2009, Defendant "again assured Mr. Clark that Clark would serve as the [sic] Verizon's subcontractor for the Help Desk Services." (Id. ¶ 30.) Thus, according to Plaintiff, when Defendant won the prime contract on October 9, 2009, the oral subcontract between Plaintiff and Defendant became binding, and Defendant's decision to reduce the scope and price of Plaintiff's work constituted a breach of that agreement. (Id. ¶¶ 47-48.)

Defendant attempts to distinguish Prime Building Corp., based on the fact that Defendant explicitly and repeatedly stated that it would not enter subcontract negotiations until after the prime contract was awarded and that any final agreement between Plaintiff and Defendant regarding the scope of services would require further negotiations and a written subcontract. (See Doc. 21 at ¶¶ 13, 16, 17, 54.) However, Plaintiff's allegations that Defendant's representatives assured Plaintiff that Plaintiff "did not face competition from other potential subcontractors" (Id. ¶ 27) and that those representatives "assured Mr. Clark that Verizon and Clark had an agreement, whereby Clark would perform the Help Desk Services scope of work for the price identified in Verizon's proposal, contingent only upon Verizon receiving the Project award from [the Commonwealth]" (Id. ¶ 28) raise its allegations above the speculative. Accordingly, at this early stage, the Court cannot find that Plaintiff has failed to state a claim.

### B. Count II: Breach of Duty to Negotiate in Good Faith

The Court previously found that the parties had manifested their mutual assent to be bound to an agreement to negotiate in good faith. (Doc. No. 18.) Defendant has adduced no

arguments to call this conclusion into question. To that end, the central question in determining whether Plaintiff has properly alleged the existence of an agreement to negotiate in good faith is whether the terms of the agreement are sufficiently definite to be enforced. Channel Home Ctrs. v. Grossman, 795 F.2d 291, 299 (3d Cir. 1986) (holding that to plead the existence of an enforceable agreement to negotiate in good faith, a plaintiff must show that: (1) both parties manifested an intent to be bound; (2) the terms of the agreement were sufficiently definite to be enforced; and (3) the agreement was supported by consideration). "The test for enforceability of an agreement is whether both parties have manifested an intention to be bound by its terms and whether the terms are sufficiently definite to be specifically enforced." ATACS Corp. v. Trans World Commc'ns, Inc., 155 F.3d 659, 665 (3d Cir. 1998); see also Lackner v. Glosser, 892 A.2d 21, 30-31 (Pa. Super. Ct. 2006) (requiring contractual terms to be "set forth with sufficient clarity"). Moreover, the enforcing party must plead each element with specificity, especially where the alleged contract is oral. Clay v. Advanced Computer Applications, Inc., 536 A.2d 1375, 1383 (Pa. Super. Ct. 1988) (en banc), rev'd on other grounds, 559 A.2d 917 (Pa. 1989); DiBonaventura v. Consol. Rail Corp., 539 A.2d 865, 868-69 (Pa. Super. Ct. 1988).

There is some ambiguity regarding what an agreement to negotiate in good faith must include to be enforceable.[3] The central disagreement between the parties here is whether an agreement which promises "good faith negotiation" – without any further clarification regarding

---

[3] The standard authorities on contract law are decidedly lacking in propounding clear rules on the issue of these agreements. See, e.g., 1 E. Allan Farnsworth, Farnsworth on Contracts § 3.26b (3d ed. 2004) ("It is therefore to be expected that there is relatively little law on the content of the duty of fair dealing under such agreements, beyond the obvious explanation that it does not obligate a party to actually reach an agreement."); 1 Corbin on Contracts § 2.8(b) ("If the parties undertake to negotiate in good faith, what conduct or motives constitute a breach of that obligation? This is difficult to answer."); see also Venture Assocs. Corp. v. Zenith Data Sys. Corp., 96 F.3d 275, 276 (7th Cir. 1996) (hereinafter "Venture II").

what good faith entails – is sufficiently definite, or whether the agreement must also include some objective measure by which the fact finder may decide if the negotiations were conducted in good or bad faith.  There is at least some support for the proposition that a party may rest on a letter of intent that provides little more than a promise to negotiate in good faith.  See, e.g., Venture Assocs. Corp. v. Zenith Data Sys. Corp., 987 F.2d 429, 433 (7th Cir. 1993) (hereinafter "Venture I") (concluding that "injecting new demands, such as an increase in price, late in the negotiating process can constitute bad faith in some circumstances").[4]

However, the Pennsylvania Superior Court has determined that if a cause of action for the breach of an agreement to negotiate in good faith were cognizable[5] that "[t]he full extent of a party's duty to negotiate in good faith [could] only be determined . . . from the terms of the letter of intent itself." Jenkins, 658 A.2d at 385 (quoting A/S Apothekernes Laboratorium for Specialpraeparater v. I.M.C. Chem. Grp., Inc., 873 F.2d 155, 158-59 (7th Cir. 1989) (concluding that "[i]n the absence of any agreed upon terms or even a general framework within which to conduct the negotiations, the parties were free to insist on or reject any proposed terms to the

---

[4] Likewise, Professor Farnsworth has questioned the practice of refusing to enforce agreements to negotiate in good faith based on lack of definite terms.  1 Farnsworth on Contracts § 3.26b ("The indefiniteness of the concept of fair dealing, is, however, a weak ground for denying relief."). In reaching this conclusion he has outlined seven practices that may constitute bad faith negotiations apart from any objective provision in the letter of intent: (1) refusal to negotiate; (2) improper tactics; (3) unreasonable proposals; (4) nondisclosure; (5) negotiation with others; (6) reneging; and (7) breaking off negotiations. Id. § 3.26c.

[5] As noted in this Court's prior order, although the Pennsylvania courts have not explicitly recognized the cause of action, this Court will follow Third Circuit precedent and conclude that Pennsylvania law would recognize such a cause of action. Channel Home, 795 F.2d at 299; see also GMH Assoc., Inc. v. Prudential Realty Grp., 752 A.2d 889, 903 (Pa. Super. Ct. 2000) (concluding that if the cause of action existed it would not apply); Jenkins v. Cnty. of Schuylkill, 658 A.2d 380, 385 (Pa. Super. Ct. 1995) (concluding that if the cause of action existed it would not apply).

contract that they wished")).  To that end, in <u>Jenkins</u> the Pennsylvania Superior Court held that a mere promise to negotiate in good faith could not support a cause of action for the breach of the duty to negotiate in good faith.  <u>Id.</u> at 381-82.  In <u>Jenkins</u> the plaintiff submitted a proposed lease agreement in response to the defendant's request for proposals.  <u>Id.</u>  The plaintiff alleged that defendant breached the agreement to negotiate in good faith by "substantially and unreasonably" altering the specifications provided in the defendant's proposal submission package.  <u>Id.</u> at 382.  Relying on the Seventh Circuit Court of Appeals's decision in <u>Apothekernes</u>, 873 F.2d at 158-59, the court concluded that because the plaintiff failed to identify "a detailed letter of intent" the trial court properly granted the defendant's demurrer on plaintiff's good faith negotiations claim.  <u>Jenkins</u>, 658 A.2d at 385.  The court went on to note that "[i]t appears that at the time of the letter, no specific terms were even agreed upon.  Moreover, the language of this letter does not reveal that the parties intended to be bound by any of the terms of the original specifications."  <u>Id.</u>

Therefore, this Court holds that an agreement to negotiate in good faith must include some "framework" or "objective criteria" by which a court can measure whether the agreement to negotiate in good faith has been breached.  This requirement is consistent with the Third Circuit's decision in <u>Channel Home</u> where the court only recognized a contract to negotiate in good faith in the context of a detailed lease agreement coupled with an "unequivocal promise" to "withdraw the Store from the rental market and only negotiate the . . . leasing transaction to completion."  <u>Channel Home</u>, 795 F.2d at 299.  This rule acknowledges the danger of applying a duty of good faith, without some limiting principles, to the process of complex commercial negotiations.  As the Seventh Circuit Court of Appeals explained, in a decision relied on by the

9

Pennsylvania Superior Court in Jenkins:

> "Good faith" is no guide. In a business transaction both sides presumably try to get the best of the deal. That is the essence of bargaining and the free market. And in the context of this case, no legal rule bounds the run of business interest. So one cannot characterize self-interest as bad faith. No particular demand in negotiations could be termed dishonest, even if it seemed outrageous to the other party. The proper recourse is to walk away from the bargaining table, not to sue for "bad faith" in negotiations.

Feldman v. Allegheny Int'l, Inc., 850 F.2d 1217 (7th Cir. 1988) (affirming the district court's directed verdict for defendant); see also Candid Prods., Inc. v. Int'l Skating Union, 530 F. Supp. 1330, 1338 (S.D.N.Y. 1982) ("On what basis does the Court decide that the [proposal] is so unreasonable so that it can determine that the proposal was contrary to good faith bargaining?").[6]

Applying this rule to the allegations contained in the amended complaint, it is clear that the contract at issue here is far too vague to be enforceable as an agreement to negotiate in good faith. The sum total of the terms of the agreement to negotiate in good faith identified by Plaintiff is an allegation that one of Defendant's representatives "orally agreed to negotiate in good faith with [Plaintiff] to enter into a final written subcontract for the Scope of Services if [Defendant] obtained an award of the prime contract from [the Commonwealth]." (Doc. No. 21 ¶ 16.) Although Plaintiff alleges this allegation is "specific enough to be enforced by this Court"

---

[6] The need to provide a clear framework by which a fact finder can determine whether a promise to negotiate in good faith has also been recognized by other courts. See, e.g., 2004 McDonald Ave. Realty, LLC v. 2004 McDonald Ave. Corp., 858 N.Y.S.2d 203, 205 (N.Y. App. Div. 2008) (requiring the agreement to set forth "objective criteria"); Valdez Fisheries Dev. Ass'n v. Alyeska Pipeline Serv. Co., 45 P.3d 657, 668 (Alaska 2002) (citing Davis v. Dykman, 938 P.2d 1002, 1009 (Alaska 1997)) ("To be enforceable, a promise to negotiate must spell out the method by which a court will determine whether or not the promise was breached."). Further, like Judge Posner, this Court is "mindful of the powerful argument that . . . courts, unlike the National Labor Relations Board or labor arbitrators, are not well equipped to determine whether people are negotiating with each other in good faith." Venture II, 96 F.3d at 277.

10

(Doc. No. 23 at 16), these allegations fall far short of the agreements to negotiate in good faith enforced by other courts.  Plaintiff has not pleaded the existence of any framework by which a fact finder could determine whether the agreement has been breached.  Plaintiff has not alleged the violation of an exclusivity requirement of the type that was violated in Channel Home.  Channel Home, 795 F.2d at 299.  Nor has Plaintiff alleged the existence of a minimum cash requirement that was present in Feldman.  Feldman, 850 F.2d at 1219.  Nor has Plaintiff even alleged that the parties agreed to be bound to adhere to the terms of the scope of work proposal in their negotiations.[7]  Plaintiff only alleges that the parties agreed to enter good faith negotiations "to provide services to Verizon in support of a prime contract."  (Doc. No. 21, Ex. I, at 97.)  Without any limiting principle against which a fact finder could measure Defendant's "good faith" the Court is unable to recognize the existence of an enforceable agreement.

The Court is mindful of the importance of enforcing agreements.  Stoner v. Stoner, 819 A.2d 529, 532 (Pa. 2003) (warning against "a paternalistic and unwarranted interference with the parties' freedom to contract"); Greene v. Oliver Realty, Inc., 526 A.2d 1192, 1197 (Pa. Super. Ct. 1987) ("The right of competent adults to contract is the lifeblood of our free enterprise system.  Voluntary agreements are the foundation of our society's freedom and prosperity.").  However, just as important as the freedom to contract is the freedom not to contract.  See, e.g., Venture II, 96 F.3d at 281 (Cudahy, J., concurring) ("Freedom not to contract should be protected as stringently as freedom to contract."); Joseph Martin, Jr., Delicatessen, Inc. v.

---

[7] Notably, Plaintiff includes an exhibit in which Defendant did explicitly agree to "enter into good faith negotiations . . . to enter into a subcontract agreement similar in form and content to that provided to you by email."  (Doc. No. 21, Ex. I, at 94.)  Presumably this agreement would suffice to establish the existence of an agreement to negotiate in good faith at the motion to dismiss stage.  However, Defendant made this agreement with a different subcontractor, and did not include a similar provision in its letter to Plaintiff.  (See id. at 97.)

Schumacher, 417 N.E.2d 541, 543 (N.Y. 1981) (the freedom to contract "is no right at all if it is not accompanied by freedom not to contract"). To that end, the Court is wary of binding parties to an agreement where the terms are insufficiently clear for fear of saddling the parties with terms, or indeed entire agreements, on which there was no meeting of the minds.

In the present action, Plaintiff has failed to present the Court with any objective measure by which a fact finder could conclude that Defendant failed to negotiate in good faith.[8] In the absence of any clearly defined objective criteria for determining what actions constitute a breach, this Court can only speculate as to what activity is supposed to have breached the agreement to negotiate in good faith and why. According to Plaintiff, "the determination of whether Verizon acted in good faith in its 'negotiations' with Clark can be determined by a fact finder." (Doc. No. 23 at 16.) However, such a determination can only be made if Plaintiff makes allegations establishing a framework for the good faith negotiations. The vague allegation of an agreement to negotiate in good faith offered here is precisely the type of agreement that the Pennsylvania Superior Court has previously refused to enforce. See Jenkins, 658 A.2d at 385. Accordingly, the motion to dismiss must be granted for failure to plead sufficiently definite terms to support the allegation of an agreement to negotiate in good faith.

### C. Count III: Unjust Enrichment

In Count III of Plaintiff's amended complaint, Plaintiff asserts a claim for unjust enrichment for "services and assistance to Verizon throughout the course of the [Request for Proposal] process at the request and benefit [sic] of Verizon, fully expecting to be compensated for such services." (Doc. No. 21 ¶ 64.) To state a claim for unjust enrichment, Plaintiff must

---

[8] Indeed, the Court notes it could just as easily conclude that Plaintiff exercised bad faith by rejecting Defendant's offer without submitting a reasonable counter-offer.

show that: (1) a benefit was conferred on Defendant by Plaintiff; (2) Defendant appreciated said benefit; and (3) Defendant's acceptance and retention of the benefit under such circumstances would be unjust without compensating Plaintiff.  Safe Auto Ins. Co. v. Berlin, 991 A.2d 327, 336 n.6 (Pa. Super. Ct. 2010).

In support of its claim, Plaintiff alleges that it provided Defendant with government relations services.  (Doc. No. 21 ¶¶ 15, 31-32, 64.)  Plaintiff further alleges that these services resulted in the Department awarding the project to Defendant.  (Id. ¶ 65.)  Finally, Plaintiff asserts that it would be unjust to permit Defendant to retain the benefit of Plaintiff's lobbying efforts without compensating Plaintiff.  (Id. ¶ 66.)  In its November 30, 2010 order, this Court concluded that Plaintiff had plausibly shown that it had engaged in lobbying efforts beyond the normal activities involved in the bidding process.  (Doc. No. 18 at 15.)  Accordingly, the Court permitted the claims to proceed.  Defendant now argues that Plaintiff's claim for unjust enrichment must be dismissed because Plaintiff's amended pleadings clarify that Plaintiff's lobbying on Defendant's behalf was inextricably linked to Plaintiff's hope that Defendant would secure the prime contract from the Department.  (Doc. No. 22 at 13-14.)  Upon review of the amended pleadings, the Court must conclude that the unjust enrichment claim cannot proceed.

The Court agrees with Plaintiff that it has pleaded sufficient facts to plausibly state that it has conferred a benefit on Defendant.  However, Plaintiff has failed to demonstrate that Defendant's receipt of this benefit, without remuneration to Plaintiff, is unjust.  "A benefit conferred is not unjustly retained if a party confers the benefit with the hope of obtaining a contract."  Burton Imaging Grp. v. Toys "r" Us, Inc., 502 F. Supp. 2d 434, 440 (E.D. Pa. 2007).  Moreover, when seeking to recover expenses under a theory of unjust enrichment, a plaintiff

must reasonably have expected reimbursement for those expenses. Allegheny Gen. Hosp. v. Philip Morris, 228 F.3d 429, 447 (3d Cir. 2000) (retention of benefit not "unjust" where plaintiffs "did not have a reasonable expectation of payment" from defendants). In the present action, Plaintiff makes clear that its efforts in lobbying the Department were done with the intention of "securing the award [of the prime contract] from [the Department]." (Doc. No. 21 ¶ 15.) Further, Plaintiff alleged that on December 31, 2008, at the onset of the parties' relationship, it specifically requested payment for its efforts on Defendant's behalf, which Defendant rejected. (Id.) Accordingly, it is clear that Plaintiff could not reasonably have expected to be compensated for its lobbying efforts and that those efforts were in fact undertaken with the purpose of furthering its own goal of securing future work from Defendant. Where, as here, "preliminary services are conferred for business reasons, without the anticipation that reimbursement will directly result, but rather, with the expectation of obtaining a hoped-for contract" a claim for unjust enrichment cannot follow. Trianco v. IBM, 583 F. Supp. 2d 649, 655 (E.D. Pa. 2008) (quoting Johnson v. Gudmundsson, 35 F.3d 1104, 1114 (7th Cir. 1994)); see also Holman Erection Co. v. Orville E. Madsen & Sons, Inc., 330 N.W.2d 693, 698 (Minn. 1983) (explaining that costs associated with the bidding process are properly understood as "part of the overhead of doing business").

**IV. CONCLUSION**

Upon consideration of Defendant's motion to dismiss Plaintiff's amended complaint, the Court concludes that it must dismiss the complaint as to counts two and three. Plaintiff's claim for the breach of the agreement to negotiate in good faith must be dismissed because Plaintiff has failed to plead the existence of terms that would permit the Court to enforce the agreement.

Although the Court initially denied a motion to dismiss Plaintiff's unjust enrichment claim, upon review of the amended complaint the Court can only conclude that the services provided by Plaintiff were provided for business purposes, and thus the claim of unjust enrichment must fail. However, because Plaintiff's complaint creates a plausible claim for a contractual agreement based on various oral promises made by Defendant, that claim will survive Defendant's motion to dismiss.

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **CLARK RESOURCES, INC.,** : | |
|     **Plaintiff** : | |
| : | **Civil Action No. 1:10-cv-1119** |
| v. : | **(Chief Judge Kane)** |
| : | |
| **VERIZON BUSINESS NETWORK** : | |
| **SERVICES, INC.,** : | |
|     **Defendant** : | |

**ORDER**

**NOW**, on this 29th day of April 2011, **IT IS HEREBY ORDERED** that Defendant's motion to dismiss (Doc. No. 22) is **GRANTED** as to counts two and three of Plaintiff's complaint. The motion is denied as to count one.

                                                    S/ Yvette Kane
                                                  Yvette Kane, Chief Judge
                                                  United States District Court
                                                  Middle District of Pennsylvania